IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Cheryl Grace,<br><br>   Plaintiff,<br><br> v.<br><br>Nielsen Holdings, PLC, The Nielsen Corporation, ACNielsen or AC Nielsen, John Doe Corporation (a/k/a New Company)<br><br>   Defendants. | Case No.<br><br>**Jury Trial Demanded** |

## **COMPLAINT**

Plaintiff, Cheryl Grace, by and through her attorneys, Stowell & Friedman, Ltd., hereby files this Complaint against Defendants Nielsen Holdings, PLC, The Nielsen Corporation, ACNielsen, AC Nielsen (collectively "Nielsen") and John Doe Corporation ("New Company") and states as follows:

## **JURISDICTION AND VENUE**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.  Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## **PARTIES**

2. Founded in the Chicagoland area, in 1923 by Arthur Nielsen after he invented an approach to measuring competitive sales results or market share known as The Nielsen Ratings, Defendant Nielsen is now an S&P 500 company with operations in over 100 countries, covering

more than 90% of the world's population. As a global measurement and data analytics company, Nielsen boasts that it provides the most complete and trusted view available of the activities of consumers and markets worldwide. Nielsen currently is divided into two business units: Nielsen Global Media ("Media") and Nielsen Global Connect ("Connect"). Media serves its clients as the "arbiter of truth" for media markets by providing media and advertising clients with unbiased and reliable metrics. Connect provides consumer packaged goods' manufacturers and retailers with accurate, actionable information and a complete picture of the changing marketplace by using predictive models. On November 7, 2019, Nielsen announced its plan to spin off the company's Connect business, creating two independent, publicly traded companies—the Global Media business and the Global Connect business. On September 29, 2020 Nielsen selected Chicago as its headquarters for the yet to be publicly named new company for Connect ("John Doe Corporation" or "New Company").

3. Cheryl Grace ("Grace") is currently Nielsen's Senior Vice President of U.S. Strategic Alliances and Consumer Engagement, a position she has held at Nielsen since 2014. Grace was first promoted to a Senior Vice President role in 2007 when she was assigned the title of Senior Vice President of Communications for the company's Consumer Packaged Goods (CPG) division and its Go-To-Market product offerings. Grace was hired by Nielsen in 2004 as its Vice President of Communications and Community Affairs for the Media Division. She has approximately 35 years of professional work experience in marketing and communications. Unlike her similarly situated white colleagues, Grace's efforts and strong performance have not been rewarded with advancement beyond an SVP role at Nielsen.

**FACTUAL ALLEGATIONS**

4.     In 2004 Nielsen's client, FOX news, launched a concerted attack and well-funded anti-Nielsen campaign, entitled "Don't Count Us Out," against the company alleging the brand did not accurately reflect diverse communities in its sample households. Nielsen was not viewed as a trusted brand in Black, Hispanic and Asian American communities throughout the country and was accused of intentionally failing to accurately represent such populations in Nielsen's ratings in the top 10 metropolitan cities. Under a firestorm of adverse publicity, and given her community, governmental and television industry experience, Nielsen wisely hired Grace to help rebuild its tarnished relationships, particularly with Blacks and Hispanics across the country.

5.     For more than 16 years, Nielsen exploited to its advantage Grace's strong personal and business relationships, as it rebuilt its name as a respected brand in diverse communities—especially in Chicago where Grace has lived since 1985. To transform Nielsen's reputation, Grace relied on her close personal and business contacts in Chicago and Illinois with elected officials, civil rights leaders, and heads of corporate and non-profit sectors. Grace and her team launched and/or created Nielsen's social investments in civic and social justice organizations, educational institutions, and grassroots initiatives that have rooted Nielsen in local and national markets.

6.     Grace has been a community stalwart with a record of involvement in non-profit organizations and/or service on various Boards, including: Executives' Club of Chicago; Girl Scouts of Greater Chicago and Northwest Indiana; Better Government Association; Chicago Foundation for Women; Chicago Children's Advocacy Center; Museum of Broadcast and Communications; Bottomless Closet; Center for New Horizons; Rainbow PUSH Coalition Corporate Council; Chicago Urban League's Golden Fellowship Dinner Gala Co-chair; Chicago

Urban League's IMPACT Leadership Development Program; Network of Executive Women's Executive Leaders' Forum Steering Committee.

7. Though not an exhaustive list, Grace has been repeatedly recognized externally and received honors for her life's work including: Black Enterprise Magazine's Top 50 Powerful Women in Business; Who's Who in Black Chicago; Uptown Professional Magazine 100 Most Influential Diverse Leaders; Network Journal's America's 25 Most Influential Black Women; Chicago Defenders' Inaugural News Makers of the Year Award; The Grio's 100 List of Solution Makers; Purdue University's Distinguished Alumni Award; National Newspapers Publishers Association Corporate Award; Chicago United's "Distinguished Business Leader of Color"; "Remarkable Person" profile in Chicago Tribune Magazine; National Diversity Council Most Powerful and Influential Women of Illinois. She is a highly sought-after speaker, thought leader and panel participant on such platforms as Congressional Black Caucus Annual Legislative Conferences, National Association Black Journalists, National Association Black Owned Broadcasters, National Newspaper Publishers Association, National Association for the Advancement of Colored People, and National Action Network, among others.

8. Grace and her teams have changed the national narrative surrounding multicultural consumers and their growing influence and impact on brands. They have favorably shifted awareness and reshaped the perception of Nielsen's brand with senior-level clients and consumers. Grace herself has a proven track record in reputation management and has overseen high-stakes projects and advised executives in crisis management, client events, consumer engagement and activations, public/government affairs, advertising, traditional and non-traditional media, research, and analytics. Grace has also been integral in establishing Nielsen's diverse external advisory councils and internal employee resource groups.

9. Notwithstanding her strong relationships and history of creating award-winning advertising, public affairs and consumer outreach campaigns, Nielsen has refused to promote Grace to Executive Vice President. Nielsen's treatment of Grace is consistent with its historical treatment of African American women. Instead of creating a succession plan, which includes the promotion of African American women to Executive Vice President or higher-ranking roles, Nielsen moves quickly to fill similar positions with external candidates to create the optic of inclusion and opportunity. Nielsen wrongly believes that these visible external hires are a substitute for developing and rewarding internal talent. But there is no viable career path to Executive Vice President for an internal female candidate who is African American.

10. For Grace, the cost of having the audacity to request a promotion to Executive Vice President has been considerable. She has consistently been a high performer and is not only well-regarded externally, but internally has also cultivated a reputation for excellence and has made a lasting contribution. Grace trained more than three white managers who were brought in at the level of Executive Vice President of Corporate Affairs, despite Grace having had the experience to execute such roles. Although Grace had positioned herself for a promotion to Executive Vice President years ago, Grace recently increased her efforts to obtain the promotion.

11. In June of 2019, Grace had a meeting with her then-manager, George Callard ("Callard"), Chief Legal Officer, during which she expressed her desire for an expanded role and concern regarding her vastly reduced budget. After Nielsen's Chief Executive Officer ("CEO") and Chief Diversity Officer ("CDO") David Kenny expressed appreciation for associates bringing forth "bold" ideas, Grace submitted a proposal to Callard, for a new role as an Executive Vice President. She followed up this request when she submitted her 2019 Self

Assessment and Performance Evaluation and again expressly stated her desire for growth within Nielsen. Grace spent considerable time and effort preparing the proposal and performance evaluation, but both efforts were ignored by Callard.

12. A few days after Grace submitted her 2019 Self-Assessment, she learned that Eric Rubenstein ("Rubenstein") would become the Chief Legal Officer for Nielsen's Connect business. Grace sent a congratulatory note to Rubenstein and Callard and emphasized that she was interested in helping to shape the transition for community affairs, corporate engagement, and government affairs. Notwithstanding her request to be involved in the process, and her expertise in these areas having represented Nielsen locally and nationally, Grace was neither sought out nor consulted; and continues to be shut out to date.

13. On February 8, 2020, Grace next submitted a proposed organizational structure for the new Connect marketing team to Jacqueline Woods ("Woods"), who is also an African American woman, after Grace learned that she would report to Woods.

14. Woods shared that others had pointed out that Grace "made a lot of money," that "it stood out," and that others wondered, "what does this team do?" Therefore, Woods explained it would be necessary for Grace to justify her team's work. Grace was told that she would need to demonstrate how the advocacy and outreach work would offer benefits to Nielsen. Woods felt it was important for someone to do advocacy from a corporate standpoint and vowed to help Grace. Woods shared with Grace that Woods noted the hostility toward Grace's earnings seemingly stemmed from that fact that Grace is an African American woman; even commenting that during Woods' professional tenure Woods had not observed others questioning the earnings of white men.

15. Grace knew that she could substantiate her proposal and justify her team's existence. The team had achieved all of the activities Grace highlighted in the proposal and for which there was a great need, such as coordinating external advisory councils, employee resource groups, and multi-cultural microsites. It had also represented Nielsen at community and industry conferences; overseen the company's community philanthropic outreach, handled the multicultural advertising strategy, and managed those agencies. Finally, Grace's team had also co-managed government affairs and launched and oversaw the Diversity Intelligence Series reports. Grace's team successfully garnered increased awareness of the Nielsen brand within diverse communities, with the message "You Matter" long before the Black Lives Matter movement took root, and persistently communicated that the company was "more passionate than ever about measuring and analyzing how people of all ethnic backgrounds interact with digital platforms, traditional media and in-store environments;" and were a "key element" of Nielsen's success.

16. During the same conversation that Woods shared that others were perturbed by Grace's earnings, Woods explained that there was "noise" around reductions and asked if Grace wanted to be "packaged out." Grace advised Woods that she did not want to be "packaged out."

17. On May 12, 2020, Grace submitted a PowerPoint presentation to Woods, which highlighted Grace's vision for her new responsibilities around corporate reputation and corporate affairs.

18. On May 26, 2020, Grace learned that corporate affairs and government affairs, would be assigned to Rubenstein. After receiving this announcement, Grace reached out to Woods regarding Grace's concerns that the Global Connect organizational announcement placed all matters pertaining to corporate affairs under Rubenstein's control. Grace expressed concern

7

about what this meant for Grace and her team. Woods responded that Woods was not going "to fight" for the responsibilities, a clear indicator that Woods did not have the will or standing to effectuate change.

19. Following the Rubenstein announcement, Grace experienced additional marginalization and disrespect. On June 4, 2020 Nielsen held a Global diversity and inclusion town hall about the state of African Americans not feeling heard or validated. Despite being one of the most prominent Nielsen executives responsible for outreach to African Americans, Grace was not invited to help plan the discussions. Grace nonetheless provided her recommendations. Further, Nielsen deployed a Black Lives Matter social media message, but Grace was not invited to weigh in. Again, Grace shared her views when she received external dismay regarding the tone of the post. As a longstanding African American leader at Nielsen, and a highly visible and recognizable executive for the company externally, particularly in the African American community, Grace felt strongly that she brought value and should have been included in these discussions and decisions.

20. Grace's role at Nielsen had been significantly marginalized as of June 2020 and she was hurt by the treatment. Kenny reached out twice to Grace around June 3, which caused Grace to believe that perhaps Kenny was a leader at Nielsen who embraced diversity, valued her contributions and would recognize her treatment as unjust. Thus, Grace found the strength to write Kenny to share her observations about her treatment and the treatment of African Americans at Nielsen.

21. On June 3, 2020, Grace submitted a letter to Kenny in his capacity as CEO, but more importantly as the company's CDO, about her concerns that diversity and inclusion were not being fully executed at home and that it was important for these efforts to start at the highest

level. Attached hereto as Exhibit A. She shared her observations that Black leaders are rarely promoted from within at Nielsen but are instead imported from the outside. Grace explained that the lack of promotion for African American women from within the company left Black females, and others, without hope. Grace also shared her observations, from both Connect and Media, that leaders circumvent African American colleagues who might offer diverse opinions and perspectives. Grace further explained that African Americans are labeled as negative, troublemakers, combative or self-aggrandizing when they seek to raise awareness of where the company is most vulnerable and described how this could damage the company's external reputation. Grace complained that the company viewed egregious acts by white employees against African Americans as "oopsie" moments, such as when a white executive referred to an African American assistant as a slave, while, in contrast, a junior African American employee was terminated for, in Nielsen's view, exercising poor "judgment" in how she disseminated an email about micro-aggressions. Finally, Grace shared with Kenny her belief that African American employees do not speak up due to fear of being labeled, fear of retaliation, fear of exclusion, fear of being blackballed in the industry and the need to survive.

22. By the time Grace wrote her letter to Kenny she had already been asked three times if she "wanted to be packaged out." She assured Kenny that she wanted to remain at Nielsen and would welcome the opportunity for a discussion. Kenny almost immediately reached out to Grace to let her know that he would contact her soon.

23. Instead of contacting Grace, however, Kenny turned Grace's letter over to Nielsen's Human Resources and the Legal departments. Rather than applauding Grace for having the courage to speak out and to seek to improve Nielsen's treatment of its African American employees, Nielsen subjected Grace to relentless and horrible retaliation. Grace's

9

letter to Kenny perfectly predicted the outcome. Nielsen punished Grace for speaking out and reporting discrimination.

24. Even Nielsen's efforts to retaliate against Grace by rewriting history regarding her performance were laced with stereotypical or racist assertions. For example, Nielsen falsely claimed that Grace years earlier had previously committed "expense fraud." Pressing for details on this false allegation, Grace learned that Nielsen claimed that Grace should not have used a limo service when she went from event to event while attending the Congressional Black Caucus Annual Legislative Conference, even though this was the standard practice. Apparently, the notion of Grace, a Black woman traveling by limo while on business, infuriated someone who reviewed the expenses and approved them but was still stewing over them several years later. Likewise, further support for the "fraud" charge was that Grace had used a makeup artist for an on-screen filming of an interview. This too was common practice. Again, the charge was approved years earlier, but apparently someone was still stewing over it too. Further, Nielsen complained that Grace had set up a one-on-one meeting between Kenny and Marc Morial ("Morial") President and CEO of the National Urban League, the nation's largest historic civil rights and urban advocacy organization, who had requested the meeting to get to know Kenny, Nielsen's new CEO. While ordinarily an employee who secures this type of introduction for executives would be applauded for securing a meeting with an important contact, after writing her letter to Kenny to expose racial discrimination, Grace was informed that unnamed people were apparently angry because Morial had the audacity to outright request a donation from Nielsen, when the normal way it is done according to Nielsen (not Grace) is through a "quid pro quo." The last example cited was that (again, several months prior), Reverend Jesse L. Jackson Sr., ("Jackson"), founder and president of the Rainbow PUSH Coalition, had the nerve to write a

letter to request that Nielsen consider promoting Grace, who had 35 years' experience and an MBA, to a position running "a line of the business." Apparently, someone at Nielsen had hostility toward Jackson. Letters of support are routinely written by white leaders on behalf of white employees without the resulting hostility. Nielsen's efforts to characterize Grace as a thief with respect to her expense account and its disturbance with the actions of Morial and Jackson, foremost civil rights leaders, alarmed Grace.

25. Grace was also contacted by Human Resources who offered Grace a package. When Grace did not accept the package by the date given, she was told that she might be terminated on August 1, 2020 if she did not sign the severance package.

26. Grace did not sign the package, but she was not terminated and remains an employee of Nielsen. Nielsen has since rescinded the offer. Nielsen has not only denied Grace a promotion to Executive Vice President but has marginalized Grace and substantially reduced her role, team, and budget — making it an almost-certain that she will never receive a promotion. Further, Nielsen's actions in retaliation for her opposition to racial discrimination have made it clear that she is no longer a valued employee of the company. After Grace repeatedly sought promotion, and after she spoke up to protest Nielsen's appalling treatment of African Americans, Nielsen attempted to push her out of the company and reduced her responsibilities, making clear she had no future with Nielsen. She knows, after more than 16 years of service to Nielsen, that the company does not support her and wants her gone.

27. Further, Nielsen's effective demotion of Grace is especially hard to square with Nielsen's recently announced decision to move its headquarters to Chicago. Grace lives in Chicago and has close, personal, long-standing business connections to the Mayor, the City Treasurer, the Lieutenant Governor, the State's Attorney, the Attorney General, the State

Comptroller, city council members and state representatives, as well as other business, media, and entertainment executives, some who have already reached out to Grace independently of Nielsen, regarding the company's new headquarters. Grace continues to be sought-after as an expert for Nielsen on multicultural matters, appearing as recently as October 17, 2020 on a national CBS This Morning news segment about diversity and products. Yet, rather than give the well-connected Grace an expanded role in its new Chicago-based business, Nielsen marginalized her in favor of white and non-complaining employees with no meaningful contacts in Chicago or understanding of the city.

28. Grace has suffered humiliation, severe emotional distress, physical illness, and loss of esteem due to the treatment. Grace's career has been irreparably harmed and her reputation damaged due to Nielsen's marginalization.

## COUNT I

### RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

29. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

30. Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, including employment relationships.

31. By the acts and conduct described above, Defendants engaged in illegal intentional racial discrimination against Plaintiff in violation of 42 U.S.C. § 1981.

32. Plaintiff has been harmed as a direct and proximate result of Defendants' unlawful conduct.

## COUNT II

## RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

33. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

34. Section 1981 makes it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as complaining to her employer about race discrimination.

35. Plaintiff engaged in protected activity by complaining about and reporting race discrimination to Defendants.

36. Defendants took adverse employment actions against Plaintiff as further discrimination and in retaliation for engaging in this protected activity.

37. Plaintiff was subjected to and harmed by Defendants' further discrimination and retaliation after he complained about Defendants' discriminatory conduct.

38. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find in her favor and against Defendants as follows:

a. Declare that the acts and conduct of Defendants are unlawful and violate 42 U.S.C. § 1981;

b. Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

c. Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendants' unlawful conduct;

d. Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

e. Award Plaintiff punitive damages due to Defendants' malicious conduct and/or Defendants' reckless or callous indifference to the statutorily protected rights of Plaintiff;

f. Award Plaintiff prejudgment interest;

g. Award Plaintiff attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 1988; and

h. Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

Respectfully submitted,

STOWELL & FRIEDMAN, LTD.

By: /s/ Linda D. Friedman

Linda D. Friedman
Matthew J. Singer
**STOWELL & FRIEDMAN, LTD.**
303 W. Madison Street, Suite 2600
Chicago, IL 60606
312-431-0888 (phone)

14