**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHERYL GRACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-06323 |
| | ) | |
| NIELSEN HOLDINGS, PLC, THE | ) | Judge Manish S. Shah |
| NIELSEN CORPORATION, ACNIELSEN | ) | |
| or AC NIELSEN, JOHN DOE | ) | |
| CORPORATION (a/k/a New Company), | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS NIELSEN HOLDINGS PLC'S, THE NIELSEN COMPANY (US), LLC'S,
AND ACNIELSEN CORPORATION'S ANSWER TO COMPLAINT**

Defendants Nielsen Holdings, Plc, The Nielsen Company (US), LLC (incorrectly identified as The Nielsen Corporation), and ACNielsen Corporation (incorrectly identified as AC Nielsen and ACNielsen) (collectively, the "Nielsen Defendants"), by and through their undersigned counsel, hereby answer Plaintiff Cheryl Grace's Complaint ("Complaint") as follows:

## JURISDICTION AND VENUE

### Paragraph 1

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

**ANSWER:** The Nielsen Defendants admit that this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. Answering further, the Nielsen Defendants admit that venue in this Court is proper pursuant to 28 U.S.C. § 1391(b). Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 1.

## PARTIES

### Paragraph 2

Founded in the Chicagoland area, in 1923 by Arthur Nielsen after he invented an approach to measuring competitive sales results or market share known as The Nielsen Ratings, Defendant Nielsen is now an S&P 500 company with operations in over 100 countries, covering more than 90% of the world's population. As a global measurement and data analytics company, Nielsen boasts that it provides the most complete and trusted view available of the activities of consumers and markets worldwide. Nielsen currently is divided into two business units: Nielsen Global Media ("Media") and Nielsen Global Connect ("Connect"). Media serves its clients as the "arbiter of truth" for media markets by providing media and advertising clients with unbiased and reliable metrics. Connect provides consumer packaged goods' manufacturers and retailers with accurate, actionable information and a complete picture of the changing marketplace by using predictive models. On November 7, 2019, Nielsen announced its plan to spin off the company's Connect business, creating two independent, publicly traded companies—the Global Media business and the Global Connect business. On September 29, 2020 Nielsen selected Chicago as its headquarters for the yet to be publicly named new company for Connect ("John Doe Corporation" or "New Company").

**ANSWER:**     The Nielsen Defendants admit that Nielsen was founded in 1923 in Chicago by

Arthur C. Nielsen, who invented an approach to measuring competitive sales results that made the

concept of "market share" a practical management tool.    Answering further, the Nielsen

Defendants admit that Nielsen is a global measurement and data analytics company that provides

the most complete and trusted view available of consumers and markets worldwide.   Answering

further, the Nielsen Defendants admit that Nielsen is an S&P 500 company and has operations in

approximately 100 countries, covering more than 90% of the world's population.   Answering

further, the Nielsen Defendants admit that prior to February 2019, Nielsen was aligned into two

reporting segments: what consumers buy ("Buy") and what consumers read, watch, and listen to

("Watch").   Answering further, the Nielsen Defendants admit that in February 2019, Nielsen

realigned its business segments from Buy and Watch to Nielsen Global Connect and Nielsen

Global Media.  Answering further, the Nielsen Defendants admit that Nielsen Global Connect provides consumer packaged goods manufacturers and retailers with accurate, actionable information and insights and a complete picture of the complex and changing marketplace that companies need to innovate and grow.  Answering further, the Nielsen Defendants admit that Nielsen Global Connect offers data and builds tools that use predictive models to turn market observations into business decisions and winning solutions.  Answering further, the Nielsen Defendants admit that Nielsen Global Media, the arbiter of truth for media markets, provides media and advertising industries with unbiased and reliable metrics that create a shared understanding of the industry required for markets to function.  Answering further, the Nielsen Defendants admit that on November 7, 2019, Nielsen announced its plan to spin off its Global Connect business, creating two independent, publicly traded companies—the Global Media business and the Global Connect business.  Answering further, the Nielsen Defendants admit that on September 29, 2020, Nielsen's Global Connect Business announced Chicago as its global headquarters as it moved forward with its journey to becoming a standalone company.  Answering further, the Nielsen Defendants admit that on October 27, 2020, Nielsen announced its Global Consumer Business would be renamed NielsenIQ in early 2021.  Answering further, the Nielsen Defendants admit that on November 1, 2020, Nielsen announced that it signed a definitive agreement under which affiliates of Advent International will acquire the Nielsen Global Connect business and that upon the completion of the transaction Nielsen Global Connect will be a private company with the flexibility to continue investing in the development and deployment of leading-edge measurement products and solutions.  Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 2.

**Paragraph 3**

> Cheryl Grace ("Grace") is currently Nielsen's Senior Vice President
> of U.S. Strategic Alliances and Consumer Engagement, a position
> she has held at Nielsen since 2014. Grace was first promoted to a
> Senior Vice President role in 2007 when she was assigned the title
> of Senior Vice President of Communications for the company's
> Consumer Packaged Goods (CPG) division and its Go-To-Market
> product offerings. Grace was hired by Nielsen in 2004 as its Vice
> President of Communications and Community Affairs for the Media
> Division. She has approximately 35 years of professional work
> experience in marketing and communications. Unlike her similarly
> situated white colleagues, Grace's efforts and strong performance
> have not been rewarded with advancement beyond an SVP role at
> Nielsen.

**ANSWER:**  The Nielsen Defendants admit that Grace began her employment with Nielsen in

2004 as a Vice President of Communications and Community Affairs for Nielsen's Watch

segment.  Answering further, the Nielsen Defendants admit that in or around 2007, Grace was first

promoted to the role of Senior Vice President, Communications, for the Buy segment's U.S.

Consumer Packaged Goods division and Go-To-Market Product offerings.  Answering further, the

Nielsen Defendants admit that in or around 2009, Grace obtained the role of Senior Vice President,

Public Affairs and Government Relations.  Answering further, the Nielsen Defendants admit that

in or around 2014, Grace obtained the role of Senior Vice President, U.S. Strategic Community

Alliances and Consumer Engagement, which she currently holds for Nielsen Global Connect.

Answering further, the Nielsen Defendants admit that during her employment at Nielsen, Grace

has never held a title more senior than Senior Vice President.  Answering further, the Nielsen

Defendants admit that they have long recognized and appreciated Grace's commitment to Nielsen

and the Black community as evidenced by her rise in the Company, promotion, current title,

breadth of responsibilities, and significant compensation.  The Nielsen Defendants lack knowledge

or information sufficient to form a belief as to the specific number of Grace's years of professional

work experience in marketing and communications, and, therefore, deny same.  Except as expressly

admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 3, including, without limitation, the false suggestion that "similarly situated" white colleagues were promoted over Grace to the position of Executive Vice President, which was retired in Nielsen's corporate divisions in early 2016 before Grace requested such title and none of Nielsen's more than 2,700 corporate employees have been awarded the title of Executive Vice President since early 2016.

## FACTUAL ALLEGATIONS

### Paragraph 4

> In 2004 Nielsen's client, FOX news, launched a concerted attack and well-funded anti-Nielsen campaign, entitled "Don't Count Us Out," against the company alleging the brand did not accurately reflect diverse communities in its sample households. Nielsen was not viewed as a trusted brand in Black, Hispanic and Asian American communities throughout the country and was accused of intentionally failing to accurately represent such populations in Nielsen's ratings in the top 10 metropolitan cities. Under a firestorm of adverse publicity, and given her community, governmental and television industry experience, Nielsen wisely hired Grace to help rebuild its tarnished relationships, particularly with Blacks and Hispanics across the country.

**ANSWER:**  The Nielsen Defendants admit that in the early 2000s, Nielsen began changing the way it tracked TV viewing in the 10 largest U.S. markets when it phased out the written diaries it had used since the 1950s in favor of an electronic device called the people meter, which measures audiences much more reliably.  Answering further, the Nielsen Defendants admit that in people meter test runs in New York and Los Angeles, many high-profile programs on News Corporation's Fox network experienced a drop in ratings, including several geared to Black and Hispanic populations.  Answering further, the Nielsen Defendants admit that in 2004, in an attempt to force a delay in Nielsen's conversion to people meters, News Corporation and a News Corporation-funded and backed group called the Don't Count Us Out coalition publicly accused Nielsen of underrepresenting minority viewers, which Nielsen denies.  Answering further, the Nielsen

Defendants admit that around the same time, Nielsen hired Grace and other Nielsen employees to help strengthen Nielsen's multicultural outreach efforts. Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 4.

### Paragraph 5

> For more than 16 years, Nielsen exploited to its advantage Grace's strong personal and business relationships, as it rebuilt its name as a respected brand in diverse communities—especially in Chicago where Grace has lived since 1985. To transform Nielsen's reputation, Grace relied on her close personal and business contacts in Chicago and Illinois with elected officials, civil rights leaders, and heads of corporate and non-profit sectors. Grace and her team launched and/or created Nielsen's social investments in civic and social justice organizations, educational institutions, and grassroots initiatives that have rooted Nielsen in local and national markets.

**ANSWER:** The Nielsen Defendants admit that during her 16-year tenure at Nielsen, Grace performed the jobs for which she was hired, placed, or promoted into and for which she received millions of dollars in compensation. Answering further, the Nielsen Defendants admit that in connection with her roles, Grace, like many other Nielsen employees, relies on professional relationships with certain elected officials, civil rights leaders, and business leaders, particularly in Chicago. Answering further, the Nielsen Defendants admit that Grace and many other Nielsen employees have helped Nielsen achieve progress in connecting with multicultural communities by, among other Nielsen efforts, creating, launching, and/or supporting Nielsen's extensive social investments in, among other important missions, civic and social justice organizations, educational institutions, and grassroots initiatives in local and national markets. Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 5.

### Paragraph 6

> Grace has been a community stalwart with a record of involvement in non-profit organizations and/or service on various Boards, including: Executives' Club of Chicago; Girl Scouts of Greater Chicago and Northwest Indiana; Better Government Association;

6

> Chicago Foundation for Women; Chicago Children's Advocacy Center; Museum of Broadcast and Communications; Bottomless Closet; Center for New Horizons; Rainbow PUSH Coalition Corporate Council; Chicago Urban League's Golden Fellowship Dinner Gala Co-chair; Chicago Urban League's IMPACT Leadership Development Program; Network of Executive Women's Executive Leaders' Forum Steering Committee.

**ANSWER:**    The Nielsen Defendants admit that Grace, like many other Nielsen employees, has been active in the community and with non-profit organizations as part of her role at Nielsen.  The Nielsen Defendants lack knowledge or information sufficient to form a belief as to Grace's specific involvement with and/or service for particular organizations, and, therefore, deny same.  Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 6.

## Paragraph 7

> Though not an exhaustive list, Grace has been repeatedly recognized externally and received honors for her life's work including:  Black Enterprise Magazine's Top 50 Powerful Women in Business; Who's Who in Black Chicago; Uptown Professional Magazine 100 Most Influential Diverse Leaders; Network Journal's America's 25 Most Influential Black Women; Chicago Defenders' Inaugural News Makers of the Year Award; The Grio's 100 List of Solution Makers; Purdue University's Distinguished Alumni Award; National Newspapers Publishers Association Corporate Award; Chicago United's "Distinguished Business Leader of Color"; "Remarkable Person" profile in Chicago Tribune Magazine; National Diversity Council Most Powerful and Influential Women of Illinois. She is a highly sought-after speaker, thought leader and panel participant on such platforms as Congressional Black Caucus Annual Legislative Conferences, National Association Black Journalists, National Association Black Owned Broadcasters, National Newspaper Publishers Association, National Association for the Advancement of Colored People, and National Action Network, among others.

**ANSWER:**    The Nielsen Defendants admit that Grace, like many other Nielsen employees, has received recognition and honors in connection with her efforts on behalf of Nielsen.  The Nielsen Defendants lack knowledge or information sufficient to form a belief as to the external recognition

and/or honors bestowed upon Grace and/or the nature of such recognition and/or honors and, therefore, deny same. The Nielsen Defendants deny the remaining allegations of Paragraph 7.

### Paragraph 8

> Grace and her teams have changed the national narrative surrounding multicultural consumers and their growing influence and impact on brands. They have favorably shifted awareness and reshaped the perception of Nielsen's brand with senior-level clients and consumers. Grace herself has a proven track record in reputation management and has overseen high-stakes projects and advised executives in crisis management, client events, consumer engagement and activations, public/government affairs, advertising, traditional and non-traditional media, research, and analytics. Grace has also been integral in establishing Nielsen's diverse external advisory councils and internal employee resource groups.

**ANSWER:** The Nielsen Defendants admit that Grace, many other Nielsen employees, and the teams on which they worked have helped Nielsen achieve progress in connecting with multicultural communities and raising awareness surrounding multicultural consumers and their growing influence and impact on brands through a variety of efforts. Answering further, the Nielsen Defendants admit that Grace and many other Nielsen employees have been active in Nielsen's External Advisory Councils, which comprise business and community leaders and industry experts who represent the African-American, Hispanic/Latino, and Asian-Pacific communities and share their views on how Nielsen can better recruit, represent, and reflect the unique purchasing and viewing habits of the multicultural communities in the U.S. Answering further, the Nielsen Defendants admit that Grace and many other Nielsen employees have been active in Nielsen's BRG programs (Business Resource Groups formerly known as Employee Resource Groups), which are Nielsen-sponsored global employee organizations designed to focus on and represent the interests of particular groups, such as veterans, LGBTQ, women, LatinX and African-Americans, with an emphasis on Nielsen's diversity, equity, and inclusion goals. Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 8.

**Paragraph 9**

> Notwithstanding her strong relationships and history of creating award-winning advertising, public affairs and consumer outreach campaigns, Nielsen has refused to promote Grace to Executive Vice President. Nielsen's treatment of Grace is consistent with its historical treatment of African American women. Instead of creating a succession plan, which includes the promotion of African American women to Executive Vice President or higher-ranking roles, Nielsen moves quickly to fill similar positions with external candidates to create the optic of inclusion and opportunity. Nielsen wrongly believes that these visible external hires are a substitute for developing and rewarding internal talent. But there is no viable career path to Executive Vice President for an internal female candidate who is African American.

**ANSWER:** The Nielsen Defendants admit that Grace has not held the position of Executive Vice President at Nielsen, and that there is no viable path to Executive Vice President for any Nielsen employee of any race or sex in Nielsen's corporate divisions because the title of Executive Vice President was retired in Nielsen's corporate divisions in early 2016 before Grace requested such title and none of Nielsen's more than 2,700 corporate employees have been awarded the title of Executive Vice President since early 2016. Answering further, the Nielsen Defendants admit that in furtherance of Nielsen's commitment to diversity and inclusion, Nielsen regularly hires diverse leaders into the organization, including, without limitation, the recent hiring of the following African-American and/or biracial senior leaders: David Rawlinson, Nielsen Global Connect's Chief Executive Officer; Jacqueline Woods, Nielsen Global Connect's Chief Marketing Officer (and Grace's current manager); Sandra Sims-Williams, Nielsen's Senior Vice President, Diversity & Inclusion; and Sean Cohan, Nielsen Global Media's Chief Growth Officer and President, International. Answering further, the Nielsen Defendants admit that in addition to hiring diverse external candidates, Nielsen promotes African-American senior leaders from within, including, without limitation, Grace; Grace's former manager, who was Nielsen's Chief Diversity Officer; the current Senior Vice President, Community Engagements; and the current Senior Vice

President, Brand Activation & Partnerships.  Except as expressly admitted, the Nielsen Defendants

deny the remaining allegations of Paragraph 9, including, without limitation, the false suggestion

that Grace was denied a promotion as she did not seek a position that existed or that was available

into which she could have been promoted, but rather sought a role that did not exist and a title that

is no longer awarded in Nielsen's corporate divisions in which Grace works.

### Paragraph 10

> For Grace, the cost of having the audacity to request a promotion to
> Executive Vice President has been considerable.  She has
> consistently been a high performer and is not only well-regarded
> externally, but internally has also cultivated a reputation for
> excellence and has made a lasting contribution. Grace trained more
> than three white managers who were brought in at the level of
> Executive Vice President of Corporate Affairs, despite Grace having
> had the experience to execute such roles. Although Grace had
> positioned herself for a promotion to Executive Vice President years
> ago, Grace recently increased her efforts to obtain the promotion.

**ANSWER:**  The Nielsen Defendants deny the allegations of Paragraph 10, including, without

limitation, the false suggestion that Grace's managers viewed Grace as having the "audacity" to

request a new role and/or title; that there was any "cost" to Grace to requesting an Executive Vice

President title as she has suffered no reduction of her annual compensation worth hundreds of

thousands; or that Grace has been a consistently high performer as she, for example, received the

second-lowest possible rating—"Inconsistent Contribution" on her 2016 performance evaluation

that was issued by her manager, the Chief Diversity Officer, who is also an African-American

woman.

### Paragraph 11

> In June of 2019, Grace had a meeting with her then-manager,
> George Callard ("Callard"), Chief Legal Officer, during which she
> expressed her desire for an expanded role and concern regarding her
> vastly reduced budget. After Nielsen's Chief Executive Officer
> ("CEO") and Chief Diversity Officer ("CDO") David Kenny
> expressed appreciation for associates bringing forth "bold" ideas,

> Grace submitted a proposal to Callard, for a new role as an Executive Vice President. She followed up this request when she submitted her 2019 Self Assessment and Performance Evaluation and again expressly stated her desire for growth within Nielsen. Grace spent considerable time and effort preparing the proposal and performance evaluation, but both efforts were ignored by Callard.

**ANSWER:** The Nielsen Defendants admit that on November 8, 2019, Grace submitted a Self-Assessment to her then-manager, George Callard, Nielsen's Chief Legal and Corporate Affairs Officer. Answering further, the Nielsen Defendants admit that in the section of the Self-Assessment titled "myAspirations," Grace stated that it was time for her to be promoted to Executive Vice President for External Affairs and offered to provide a draft of a complete job description for the role. Answering further, the Nielsen Defendants admit that David Kenny, Nielsen's Chief Executive Officer and Chief Diversity Officer, appreciates associates who bring forth bold ideas. Answering further, the Nielsen Defendants admit that on December 3, 2019, nearly a month after Nielsen announced its plan to spin off its Global Connect business into an independent, publicly-traded company, Grace sent Mr. Callard an email titled "A Bold Proposal"; attached to the email was a job proposal that Grace believed "would be helpful in advancing Nielsen's external brand presence – particularly the Media business," which Grace is no longer a part of; the proposal was for the position of Executive Vice President, External Affairs and Engagement; and Mr. Callard reviewed Grace's proposal and discussed it with her. Answering further, the Nielsen Defendants admit that the positions of Executive Vice President of External Affairs and Executive Vice President, External Affairs and Engagement, did not exist within Nielsen and at the time of Grace's proposal, the Executive Vice President title had been retired in Nielsen's corporate divisions in which Grace worked in early 2016 and none of Nielsen's more than 2,700 corporate employees have been awarded the title of Executive Vice President since early 2016. The Nielsen Defendants lack knowledge or information sufficient to form a belief as to

time and effort expended by Grace in preparing the foregoing Self-Assessment or proposal and,

therefore, deny same. Except as expressly admitted, the Nielsen Defendants deny the remaining

allegations of Paragraph 11, including, without limitation, the false suggestion that Mr. Callard ever

ignored Grace's efforts.

### Paragraph 12

A few days after Grace submitted her 2019 Self-Assessment, she learned that Eric Rubenstein ("Rubenstein") would become the Chief Legal Officer for Nielsen's Connect business. Grace sent a congratulatory note to Rubenstein and Callard and emphasized that she was interested in helping to shape the transition for community affairs, corporate engagement, and government affairs. Notwithstanding her request to be involved in the process, and her expertise in these areas having represented Nielsen locally and nationally, Grace was neither sought out nor consulted; and continues to be shut out to date.

**ANSWER:** The Nielsen Defendants admit that on November 13, 2019, days after Nielsen

announced its plan to spin off its Global Connect business into an independent, publicly traded

company and before any determination had been made as to whether Grace's function would report

into Eric Rubenstein, Chief Legal Officer for Nielsen Global Connect, after the spin (it ultimately

did not), Grace sent an email to Mr. Rubenstein and George Callard, congratulating Mr.

Rubenstein for his new role and stating that she was interested in helping determine how Nielsen

shaped the transition for corporate engagement and government affairs (neither of which were part

of Grace's role), as well as community affairs, the transition of which senior leaders at Nielsen

were already tasked with handling. Answering further, the Nielsen Defendants state that Mr.

Rubenstein responded by thanking Grace for her note. Except as expressly admitted, the Nielsen

Defendants deny the remaining allegations of Paragraph 12.

### Paragraph 13

On February 8, 2020, Grace next submitted a proposed organizational structure for the new Connect marketing team to

Jacqueline Woods ("Woods"), who is also an African American woman, after Grace learned that she would report to Woods.

**ANSWER:** The Nielsen Defendants admit that Jacqueline Woods, Grace's current manager, who is also an African-American woman, asked Grace and all of Ms. Woods's other direct reports to submit a proposal relating to Nielsen Global Connect's Marketing team structure and how each would improve performance with a focus on coverage and revenue optimization. Answering further, the Nielsen Defendants admit that Grace sent Ms. Woods a proposal on February 8, 2020. Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 13.

### Paragraph 14

Woods shared that others had pointed out that Grace "made a lot of money," that "it stood out," and that others wondered, "what does this team do?" Therefore, Woods explained it would be necessary for Grace to justify her team's work. Grace was told that she would need to demonstrate how the advocacy and outreach work would offer benefits to Nielsen. Woods felt it was important for someone to do advocacy from a corporate standpoint and vowed to help Grace. Woods shared with Grace that Woods noted the hostility toward Grace's earnings seemingly stemmed from that fact that Grace is an African American woman; even commenting that during Woods' professional tenure Woods had not observed others questioning the earnings of white men.

**ANSWER:** The Nielsen Defendants admit that Jacqueline Woods, Grace's current manager, who is also an African-American woman, asked Grace and all of Ms. Woods's other direct reports to submit a proposal relating to Nielsen Global Connect's Marketing team structure and how each would improve performance with a focus on coverage and revenue optimization. Answering further, the Nielsen Defendants admit that Ms. Woods did convey to Grace that others had commented that Grace makes a lot of money and they did not know what Grace's role was at Nielsen, and that Ms. Woods felt it was important and encouraged and helped Grace to make more visible

the commercial value and return on investment that Grace brings to Nielsen. Except as expressly

admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 14.

**Paragraph 15**

> Grace knew that she could substantiate her proposal and justify her team's existence. The team had achieved all of the activities Grace highlighted in the proposal and for which there was a great need, such as coordinating external advisory councils, employee resource groups, and multi-cultural microsites. It had also represented Nielsen at community and industry conferences; overseen the company's community philanthropic outreach, handled the multicultural advertising strategy, and managed those agencies. Finally, Grace's team had also co-managed government affairs and launched and oversaw the Diversity Intelligence Series reports. Grace's team successfully garnered increased awareness of the Nielsen brand within diverse communities, with the message "You Matter" long before the Black Lives Matter movement took root, and persistently communicated that the company was "more passionate than ever about measuring and analyzing how people of all ethnic backgrounds interact with digital platforms, traditional media and in-store environments;" and were a "key element" of Nielsen's success.

**ANSWER:** The Nielsen Defendants admit that Grace, many other Nielsen employees, and/or

the team(s) on which they have worked have been active in external advisory councils, employee

resource groups, and multicultural outreach efforts, all of which are important to Nielsen.

Answering further, the Nielsen Defendants admit that Grace, many other Nielsen employees,

and/or the team(s) on which they have worked have represented Nielsen at community and

industry events and have been involved in Nielsen's community philanthropic and multicultural

outreach and strategy. Answering further, the Nielsen Defendants admit that at certain times

during Grace's employment, the team(s) on which Grace has worked and other Nielsen employees

and teams have been involved in government affairs and with Nielsen's Diverse Intelligence Series

of annual reports about U.S. multicultural communities. Answering further, the Nielsen

Defendants admit that Grace, many other Nielsen employees, and/or the team(s) on which they

have worked have increased awareness of the Nielsen brand within diverse communities. Answering further, the Nielsen Defendants admit that Grace, many other Nielsen employees, and/or the team(s) on which they have worked were involved in Nielsen's "You Matter" multicultural campaigns. Answering further, the Nielsen Defendants admit that Nielsen has communicated: "We're more passionate than ever about measuring and analyzing how people of all ethnic backgrounds interact with digital platforms, traditional media and in-store environments. You are a key element of our success." Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 15.

**Paragraph 16**

> During the same conversation that Woods shared that others were perturbed by Grace's earnings, Woods explained that there was "noise" around reductions and asked if Grace wanted to be "packaged out." Grace advised Woods that she did not want to be "packaged out."

**ANSWER:** The Nielsen Defendants admit that among other various budget reduction and cost-cutting measures Nielsen had been taking for several years, in 2020, as a result of, among other things, the impact of the COVID-19 pandemic on the global economy, financial markets, and Nielsen's business, as well as the projected costs associated with the anticipated spin-off of the Nielsen Global Connect business, Nielsen initiated a significant company-wide reduction-in-force across the entire Nielsen business that resulted in the separation of thousands of Nielsen employees. Answering further, the Nielsen Defendants admit that in connection with the significant reduction-in-force, Grace's manager, Jacqueline Woods, who is also an African-American woman, asked Grace and others on Ms. Woods's team who were eligible whether they had any interest in the generous separation packages being offered. Answering further, the Nielsen Defendants admit that Grace told Ms. Woods that she was not interested in the separation package

at that time.  Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 16.

### Paragraph 17

> On May 12, 2020, Grace submitted a PowerPoint presentation to Woods, which highlighted Grace's vision for her new responsibilities around corporate reputation and corporate affairs.

**ANSWER:**  The Nielsen Defendants admit that on or around May 12, 2020, Grace's assistant, on behalf of Grace, submitted three PowerPoint slides to Grace's current manager, Jacqueline Woods.  Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 17, including the false suggestion that Grace's job had ever encompassed responsibility for corporate reputation or corporate affairs.

### Paragraph 18

> On May 26, 2020, Grace learned that corporate affairs and government affairs, would be assigned to Rubenstein. After receiving this announcement, Grace reached out to Woods regarding Grace's concerns that the Global Connect organizational announcement placed all matters pertaining to corporate affairs under Rubenstein's control. Grace expressed concern about what this meant for Grace and her team. Woods responded that Woods was not going "to fight" for the responsibilities, a clear indicator that Woods did not have the will or standing to effectuate change.

**ANSWER:**  The Nielsen Defendants admit that on May 26, 2020, Nielsen Global Connect announced that its Legal & Corporate Affairs team, led by Eric Rubenstein, would oversee, among other things, Government Affairs and Global Responsibility and Sustainability, none of which had been assigned to, or taken away from, Grace or the Nielsen Global Connect Marketing team, nor had been assigned to Grace during her prior tenure reporting to Nielsen's Chief Legal and Corporate Affairs Officer, George Callard.  Answering further, the Nielsen Defendants admit that Grace and her manager, Jacqueline Woods, did have a conversation about the May 26, 2020 organizational announcement with respect to Mr. Rubenstein's team in which Ms. Woods

conveyed, among other things, that Ms. Woods was not going to contest the organizational update relating to functions that were not part of Grace's job. Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 18, including, without limitation, the false suggestion that Ms. Woods does not have the will or standing to effectuate change.

### Paragraph 19

> Following the Rubenstein announcement, Grace experienced additional marginalization and disrespect. On June 4, 2020 Nielsen held a Global diversity and inclusion town hall about the state of African Americans not feeling heard or validated. Despite being one of the most prominent Nielsen executives responsible for outreach to African Americans, Grace was not invited to help plan the discussions. Grace nonetheless provided her recommendations. Further, Nielsen deployed a Black Lives Matter social media message, but Grace was not invited to weigh in. Again, Grace shared her views when she received external dismay regarding the tone of the post. As a longstanding African American leader at Nielsen, and a highly visible and recognizable executive for the company externally, particularly in the African American community, Grace felt strongly that she brought value and should have been included in these discussions and decisions.

**ANSWER:** The Nielsen Defendants admit that on June 4, 2020, days after the George Floyd murder, Nielsen held a Town Hall regarding Nielsen's commitment to fight racism with action, including, without limitation, ensuring that all voices, including those of African-Americans, are heard. Answering further, the Nielsen Defendants admit that the Town Hall was planned by Sandra Sims-Williams, its Senior Vice President, Diversity, Equity, & Inclusion, an African-American woman whose responsibility it was to plan the Town Hall. Answering further, the Nielsen Defendants admit that the Town Hall speakers were David Kenny, Nielsen' Chief Executive Officer and Chief Diversity Officer; Ms. Sims-Williams; David Rawlinson, Nielsen Global Connect's Chief Executive Officer, an African-American; Sean Cohan, Nielsen Global Media's Chief Growth Officer and President, International, who is biracial; and two external, African-American speakers. Answering further, the Nielsen Defendants admit that as head of

Diversity, Equity, & Inclusion, Ms. Sims-Williams was responsible to plan the Town Hall event and thus did not invite Grace to help plan the event, nor was planning the Town Hall within Grace's responsibilities or duties at Nielsen. Answering further, the Nielsen Defendants admit that Nielsen deployed a social media message in support of the Black Lives Matter movement and the fight against racial and social inequality. Answering further, the Nielsen Defendants admit that Ms. Williams led the efforts regarding that posting. Answering further, the Nielsen Defendants admit that Grace was not one of the African-American Nielsen employees who was consulted about the Black Lives Matter post, nor was consulting on social media messages part of Grace's responsibilities or duties at Nielsen. Answering further, the Nielsen Defendants admit that Grace was critical of Nielsen's Black Lives Matter posting. Answering further, the Nielsen Defendants admit that Grace has been an African-American leader at Nielsen during her 16-year Nielsen career and is a visible and recognizable executive for Nielsen in parts of the Black community. The Nielsen Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that Grace "felt strongly that she brought value and should have been included in these discussions and decisions" and, therefore, deny same. Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 19.

**Paragraph 20**

> Grace's role at Nielsen had been significantly marginalized as of June 2020 and she was hurt by the treatment. Kenny reached out twice to Grace around June 3, which caused Grace to believe that perhaps Kenny was a leader at Nielsen who embraced diversity, valued her contributions and would recognize her treatment as unjust. Thus, Grace found the strength to write Kenny to share her observations about her treatment and the treatment of African Americans at Nielsen.

**ANSWER:** The Nielsen Defendants admit that David Kenny, Chief Executive Officer and Chief Diversity Officer of Nielsen, embraces diversity and inclusion as a key imperative of the

corporate identity of Nielsen, which, under Mr. Kenny's leadership, was recently named No. 20

on the 2020 DiversityInc Top 50 and earned a 100% score on the Human Rights Campaign (HRC)

Foundation's Corporate Equality Index, among other awards and recognition.  Answering further,

the Nielsen Defendants admit that Mr. Kenny values Grace's contributions and has regularly

reached out to Grace.  Except as expressly admitted, the Nielsen Defendants deny the remaining

allegations of Paragraph 20, including the false suggestion that Grace has been "marginalized" as

she continues to represent Nielsen in very prominent and public ways, including, without limitation,

on behalf of Nielsen, being interviewed for a CNBC article published on July 5, 2020, appearing

on the national CBS This Morning news on October 17, 2020, and appearing in a December 28,

2020 Forbes article.

## Paragraph 21

On June 3, 2020, Grace submitted a letter to Kenny in his capacity as CEO, but more importantly as the company's CDO, about her concerns that diversity and inclusion were not being fully executed at home and that it was important for these efforts to start at the highest level. Attached hereto as Exhibit A. She shared her observations that Black leaders are rarely promoted from within at Nielsen but are instead imported from the outside. Grace explained that the lack of promotion for African American women from within the company left Black females, and others, without hope.  Grace also shared her observations, from both Connect and Media, that leaders circumvent African American colleagues who might offer diverse opinions and perspectives. Grace further explained that African Americans are labeled as negative, troublemakers, combative or self-aggrandizing when they seek to raise awareness of where the company is most vulnerable and described how this could damage the company's external reputation. Grace complained that the company viewed egregious acts by white employees against African Americans as "oopsie" moments, such as when a white executive referred to an African American assistant as a slave, while, in contrast, a junior African American employee was terminated for, in Nielsen's view, exercising poor "judgment" in how she disseminated an email about micro-aggressions. Finally, Grace shared with Kenny her belief that African American employees do not speak up due to fear of being labeled, fear of

retaliation, fear of exclusion, fear of being blackballed in the industry and the need to survive.

**ANSWER:**   The Nielsen Defendants admit that Grace sent a letter containing various contentions to David Kenny, Chief Executive Officer and Chief Diversity Officer of Nielsen, on June 16, 2020 (the "Letter"), a true and correct copy of which appears to be attached as Exhibit A to Grace's Complaint.  Answering further, the Nielsen Defendants admit that in the Letter, Grace praised Mr. Kenny for being a "very special guy" and said she "value[d] [his] inclusion" and "will always respect [his] brand of leadership."  Answering further, the Nielsen Defendants admit that in furtherance of Nielsen's commitment to diversity and inclusion, Nielsen regularly hires diverse leaders into the organization, including, without limitation, the recent hiring of the following African-American and/or biracial senior leaders: David Rawlinson, Nielsen Global Connect's Chief Executive Officer; Jacqueline Woods, Nielsen Global Connect's Chief Marketing Officer (and Grace's manager); Sandra Sims-Williams, Nielsen's Senior Vice President of Diversity, Equity, & Inclusion; and Sean Cohan, Nielsen Global Media's Chief Growth Officer and President, International.  Answering further, the Nielsen Defendants admit that in addition to hiring diverse external candidates, Nielsen promotes African-American senior leaders from within, including, without limitation, Grace; Grace's former manager, who was Nielsen's Chief Diversity Officer; the current Senior Vice President, Community Engagements; and the current Senior Vice President, Brand Activation & Partnerships.  Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 21, including, without limitation, the false suggestion that Nielsen does not promote diverse employees from within, that a white senior executive referred to her African-American assistant as a slave, or that a junior African-American associate who was terminated within 90 days of employment after exhibiting extensive performance deficiencies was actually terminated for disseminating an email about microaggressions.

**Paragraph 22**

> By the time Grace wrote her letter to Kenny she had already been asked three times if she "wanted to be packaged out." She assured Kenny that she wanted to remain at Nielsen and would welcome the opportunity for a discussion. Kenny almost immediately reached out to Grace to let her know that he would contact her soon.

**ANSWER:** The Nielsen Defendants admit that prior to Grace sending David Kenny the Letter, Nielsen was conducting a significant company-wide reduction-in-force across the entire Nielsen business that resulted in the separation of thousands of Nielsen employees. Answering further, the Nielsen Defendants admit that in connection with that significant reduction-in-force, Grace's manager, who is also an African-American woman, asked Grace and others who were eligible whether they had any interest in the generous separation packages being offered. Answering further, the Nielsen Defendants admit that after Mr. Kenny received the Letter, he almost immediately responded to Grace, thanking her for sharing her thoughts and conveying to Grace that he really cared about her and her feelings. Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 22, including, without limitation, the false suggestion that Grace assured Mr. Kenny in the Letter that she wanted to remain at Nielsen and would welcome the opportunity for a discussion, as she stated in the Letter: "After demurring I have given it careful thought and consideration and I believe that I have no alternative other than to discuss how we part ways…. Alternatively, if there is an option for me to stay and perform at a level worthy of my talents, I would be interested in exploring that possibility."

**Paragraph 23**

> Instead of contacting Grace, however, Kenny turned Grace's letter over to Nielsen's Human Resources and the Legal departments. Rather than applauding Grace for having the courage to speak out and to seek to improve Nielsen's treatment of its African American employees, Nielsen subjected Grace to relentless and horrible retaliation. Grace's letter to Kenny perfectly predicted the outcome.

> Nielsen punished Grace for speaking out and reporting discrimination.

**ANSWER:**    The Nielsen Defendants admit that David Kenny almost immediately responded to Grace's Letter. Answering further, the Nielsen Defendants admit that it was Grace who first brought the Letter to the attention of Nielsen's Legal Department, as she forwarded a copy of the Letter to Nielsen's Chief Legal and Corporate Affairs Officer within three minutes of sending the Letter to Kenny.  Answering further, the Nielsen Defendants admit that Mr. Kenny took the allegations in the Letter very seriously and, given the nature of the Letter and consistent with Nielsen policy, he informed Nielsen's Human Resources and Legal Departments of the Letter. Answering further, the Nielsen Defendants admit that on June 30, 2020, fourteen (14) days after Grace sent the Letter and before Mr. Kenny had the opportunity to have a substantive discussion with Grace about the Letter, Grace's attorney notified Nielsen's Chief Legal and Corporate Affairs Officer that she had been retained to represent Grace.  Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 23, including, without limitation, the false suggestion that Mr. Kenny did not contact Grace about the Letter or that Nielsen subjected Grace to retaliation or punished her for submitting the Letter or for any other reason.

### Paragraph 24

> Even Nielsen's efforts to retaliate against Grace by rewriting history regarding her performance were laced with stereotypical or racist assertions. For example, Nielsen falsely claimed that Grace years earlier had previously committed "expense fraud." Pressing for details on this false allegation, Grace learned that Nielsen claimed that Grace should not have used a limo service when she went from event to event while attending the Congressional Black Caucus Annual Legislative Conference, even though this was the standard practice. Apparently, the notion of Grace, a Black woman traveling by limo while on business, infuriated someone who reviewed the expenses and approved them but was still stewing over them several years later. Likewise, further support for the "fraud" charge was that Grace had used a makeup artist for an on-screen filming of an interview. This too was common practice. Again, the charge was

approved years earlier, but apparently someone was still stewing over it too. Further, Nielsen complained that Grace had set up a one-on-one meeting between Kenny and Marc Morial ("Morial") President and CEO of the National Urban League, the nation's largest historic civil rights and urban advocacy organization, who had requested the meeting to get to know Kenny, Nielsen's new CEO. While ordinarily an employee who secures this type of introduction for executives would be applauded for securing a meeting with an important contact, after writing her letter to Kenny to expose racial discrimination, Grace was informed that unnamed people were apparently angry because Morial had the audacity to outright request a donation from Nielsen, when the normal way it is done according to Nielsen (not Grace) is through a "quid pro quo." The last example cited was that (again, several months prior), Reverend Jesse L. Jackson Sr., ("Jackson"), founder and president of the Rainbow PUSH Coalition, had the nerve to write a letter to request that Nielsen consider promoting Grace, who had 35 years' experience and an MBA, to a position running "a line of the business." Apparently, someone at Nielsen had hostility toward Jackson. Letters of support are routinely written by white leaders on behalf of white employees without the resulting hostility. Nielsen's efforts to characterize Grace as a thief with respect to her expense account and its disturbance with the actions of Morial and Jackson, foremost civil rights leaders, alarmed Grace.

**ANSWER:**     The Nielsen Defendants admit that Grace has submitted expenses for, among other things, car service and hair and makeup, all of which were paid. Answering further, the Nielsen Defendants admit that David Kenny has met with Marc Morial, President and CEO of the National Urban League, an historic civil rights and urban advocacy organization. Answering further, the Nielsen Defendants admit that Mr. Morial, like many other civic and social justice organizations that Nielsen supports, asked Mr. Kenny for a donation from Nielsen. Answering further, the Nielsen Defendants admit that Mr. Kenny believed that Mr. Morial did a great job explaining the mission of the Urban League and what the Urban League could do with Nielsen and has had conversations with him since. Answering further, the Nielsen Defendants admit that on February 21, 2020, Reverend Jesse L. Jackson Sr., founder and president of the Rainbow PUSH Coalition, sent Mr. Kenny a letter, in which Jackson praised Nielsen's "diverse C-Suite team" and Nielsen

"moving in such a diverse direction beginning in 2004." Answering further, the Nielsen Defendants admit that in his letter, Rev. Jackson suggested that Nielsen consider Grace for an elevated position as Nielsen continues to grow and opined that Grace would make a "fine president" for one of Nielsen's divisions. Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 24.

## Paragraph 25

> Grace was also contacted by Human Resources who offered Grace a package. When Grace did not accept the package by the date given, she was told that she might be terminated on August 1, 2020 if she did not sign the severance package.

**ANSWER:** The Nielsen Defendants admit that in June 2020, in response to Grace's request in her June 16, 2020 Letter to David Kenny that "[a]fter demurring [she] [has] given it careful thought and consideration and [she] believe[d] that [she] ha[d] no alternative other than to discuss how [she and Nielsen] part ways," on June 26, 2020, Nielsen Global Connect's Chief People Officer offered Grace a generous voluntary separation package with a proposed separation date of August 1, 2020. Answering further, the Nielsen Defendants admit that in July 2020, and at Grace's request, Nielsen Global Connect's Chief People Officer discussed with Grace a potential alternative, voluntary proposal under which Grace would separate from Nielsen and become an independent consultant for Nielsen. Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 25.

## Paragraph 26

> Grace did not sign the package, but she was not terminated and remains an employee of Nielsen. Nielsen has since rescinded the offer. Nielsen has not only denied Grace a promotion to Executive Vice President but has marginalized Grace and substantially reduced her role, team, and budget — making it an almost-certain that she will never receive a promotion. Further, Nielsen's actions in retaliation for her opposition to racial discrimination have made it clear that she is no longer a valued employee of the company. After

Grace repeatedly sought promotion, and after she spoke up to protest Nielsen's appalling treatment of African Americans, Nielsen attempted to push her out of the company and reduced her responsibilities, making clear she had no future with Nielsen. She knows, after more than 16 years of service to Nielsen, that the company does not support her and wants her gone.

**ANSWER:** The Nielsen Defendants admit that Grace has not signed any separation package with Nielsen and that Grace remains a valued and high-compensated senior employee of Nielsen. Answering further, the Nielsen Defendants admit that Grace has not been given the title of Executive Vice President, a title that was retired in early 2016 in Nielsen's corporate divisions in which Grace works, before Grace's request, and has not been awarded to any of Nielsen's more than 2,700 corporate employees since early 2016. Answering further, the Nielsen Defendants admit that due to ongoing budget reduction and cost-cutting measures that Nielsen implemented over the course of several years, including 2018–2020, in the midst of a public strategic review beginning in 2018, budget reductions were made with respect to the team on which Grace works (and many other teams across the Nielsen organization) under the direction Nielsen's then-Chief Financial Officer, an African-American, and Grace's then-manager, the Chief Diversity Officer, an African-American woman. Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 26, including, without limitation, that Nielsen has retaliated against Grace, marginalized her role, reduced her responsibilities, or tried to push her out of Nielsen, as Grace continues to represent Nielsen in very prominent and public ways, including, without limitation, on behalf of Nielsen, being interviewed for a CNBC article published on July 5, 2020, appearing on the national CBS This Morning news on October 17, 2020, and appearing in a December 28, 2020 Forbes article; that Nielsen rescinded the offer, which Grace affirmatively rejected; and the false suggestion that Grace was denied a promotion as she did not seek a position

that existed and was available into which she could have been promoted, but rather sought a role that did not exist.

### Paragraph 27

>Further, Nielsen's effective demotion of Grace is especially hard to square with Nielsen's recently announced decision to move its headquarters to Chicago. Grace lives in Chicago and has close, personal, long-standing business connections to the Mayor, the City Treasurer, the Lieutenant Governor, the State's Attorney, the Attorney General, the State Comptroller, city council members and state representatives, as well as other business, media, and entertainment executives, some who have already reached out to Grace independently of Nielsen, regarding the company's new headquarters. Grace continues to be sought-after as an expert for Nielsen on multicultural matters, appearing as recently as October 17, 2020 on a national CBS This Morning news segment about diversity and products. Yet, rather than give the well-connected Grace an expanded role in its new Chicago-based business, Nielsen marginalized her in favor of white and non-complaining employees with no meaningful contacts in Chicago or understanding of the city.

**ANSWER:** The Nielsen Defendants admit that on September 29, 2020, Nielsen's Global Connect business announced Chicago as its global headquarters. Answering further, the Nielsen Defendants admit that Grace lives in Chicago and has certain professional relationships with certain elected officials and business leaders in Chicago. Answering further, the Nielsen Defendants admit that on October 17, 2020, Grace, on behalf of Nielsen, appeared on a national CBS This Morning news segment about diversity and products. The Nielsen Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations relating to the nature and extent of Grace's specific relationships with elected officials and business leaders in Chicago and, therefore, deny same. Except as expressly admitted, the Nielsen Defendants deny the remaining allegations of Paragraph 27, including, without limitation, that Grace was demoted, that Grace was effectively demoted, or that Grace has been marginalized in favor of white and non-complaining employees.

**Paragraph 28**

Grace has suffered humiliation, severe emotional distress, physical illness, and loss of esteem due to the treatment. Grace's career has been irreparably harmed and her reputation damaged due to Nielsen's marginalization.

**ANSWER:** The Nielsen Defendants deny the allegations of Paragraph 28, including the false suggestions that any harm suffered by Grace, if any, was the result of Nielsen's conduct or that Grace has been "marginalized" as she continues to represent Nielsen in very prominent and public ways, including, without limitation, on behalf of Nielsen, being interviewed for a CNBC article published on July 5, 2020, appearing on the national CBS This Morning news on October 17, 2020, and appearing in a December 28, 2020 Forbes article.

**COUNT I**

**Paragraph 29**

Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

**ANSWER:** The Nielsen Defendants incorporate their answers to Paragraphs 1 through 28 as if fully set forth herein.

**Paragraph 30**

Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, including employment relationships.

**ANSWER:** The Nielsen Defendants state that Paragraph 30 states a legal conclusion for which no response is required. To the extent that Paragraph 30 contains factual allegations to which a response is required, the Nielsen Defendants deny the allegations of Paragraph 30.

27

### Paragraph 31

By the acts and conduct described above, Defendants engaged in illegal intentional racial discrimination against Plaintiff in violation of 42 U.S.C. § 1981.

**ANSWER:**     The Nielsen Defendants deny the allegations of Paragraph 31.

### Paragraph 32

Plaintiff has been harmed as a direct and proximate result of Defendants' unlawful conduct.

**ANSWER:**     The Nielsen Defendants deny the allegations of Paragraph 32.

## COUNT II

### Paragraph 33

Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

**ANSWER:**     The Nielsen Defendants incorporate their answers to Paragraphs 1 through 32 as if fully set forth herein.

### Paragraph 34

Section 1981 makes it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as complaining to her employer about race discrimination.

**ANSWER:**     The Nielsen Defendants state that Paragraph 34 states a legal conclusion for which no response is required. To the extent that Paragraph 34 contains factual allegations to which a response is required, the Nielsen Defendants deny the allegations of Paragraph 34.

### Paragraph 35

Plaintiff engaged in protected activity by complaining about and reporting race discrimination to Defendants.

**ANSWER:**    The Nielsen Defendants state that Paragraph 35 states a legal conclusion for which no response is required.  To the extent that Paragraph 35 contains factual allegations to which a response is required, the Nielsen Defendants deny the allegations of Paragraph 35.

### Paragraph 36

Defendants took adverse employment actions against Plaintiff as further discrimination and in retaliation for engaging in this protected activity.

**ANSWER:**    The Nielsen Defendants deny the allegations of Paragraph 36.

### Paragraph 37

Plaintiff was subjected to and harmed by Defendants' further discrimination and retaliation after he [sic] complained about Defendants' discriminatory conduct.

**ANSWER:**    The Nielsen Defendants deny the allegations of Paragraph 37.

### Paragraph 38

As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages.

**ANSWER:**    The Nielsen Defendants deny the allegations of Paragraph 38.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find in its favor and against Plaintiff as follows:

a.  Declare that the acts and conduct of Defendants are unlawful and violate 42 U.S.C. § 1981;

b.  Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

c.  Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendants' unlawful conduct;

d.  Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

e.  Award Plaintiff punitive damages due to Defendants' malicious conduct and/or Defendants' reckless or callous indifference to the statutorily protected rights of Plaintiff;

f.  Award Plaintiff prejudgment interest;

g.  Award Plaintiff attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 1988; and

h.  Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

**ANSWER:**  The Nielsen Defendants deny the allegations of the unnumbered "WHEREFORE" Paragraph and further deny that Grace is entitled to either the relief requested in the unnumbered "WHEREFORE" Paragraph or any relief whatsoever.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

**ANSWER:**  The Nielsen Defendants admit that Grace purports to request a trial by jury.

## AFFIRMATIVE AND/OR ADDITIONAL DEFENSES

The Nielsen Defendants hereby state the following affirmative and additional defenses to the Complaint but do not assume the burden of proof on any such defense except as required by applicable law with respect to the particular defense asserted. The Nielsen Defendants reserve the right to assert other affirmative and/or additional defenses and/or to otherwise supplement their response upon discovery of facts or evidence rendering such action appropriate.

## FIRST DEFENSE

1.  The Complaint and all causes of action set forth therein are barred by Grace's failure to state a cause of action upon which relief may be granted against Nielsen.

## SECOND DEFENSE

2.  Grace's claims are barred, in whole or in part, to the extent they arose outside of

the applicable statute(s) of limitations.

## THIRD DEFENSE

3.      Nielsen's actions or omissions, if any, were justified by legitimate, non-discriminatory, and non-retaliatory reasons.

## FOURTH DEFENSE

4.      The Complaint fails to set forth facts and circumstances that would support an award of compensatory, exemplary, or punitive damages.

## FIFTH DEFENSE

5.      Nielsen acted in good faith and without any discriminatory or retaliatory motive, intent, malice, or reckless disregard for Grace's rights.

## SIXTH DEFENSE

6.      Any alleged misconduct by any Nielsen employee that affected Grace, a claim that the Nielsen Defendants expressly deny, was done without the authority, knowledge, approval, or ratification of Nielsen, and in conflict with and in violation of Nielsen's policies.

## SEVENTH DEFENSE

7.      Grace's claims are barred, in whole or part, because Grace has suffered no adverse employment action.

## EIGHTH DEFENSE

8.      Grace's alleged damages are speculative and thus unavailable as a matter of law.

## NINTH DEFENSE

9.      Subject to proof through discovery, some or all of the claims of Plaintiff may be barred, in whole or in part, by the doctrine of after-acquired evidence or by the equitable doctrines of waiver, estoppel, laches, and/or unclean hands.

**TENTH DEFENSE**

10.     Nielsen Holdings plc, AC Nielsen Corporation, AC Nielsen, ACNielsen, and John

Doe Corporation are not proper parties to this lawsuit.

**ELEVENTH DEFENSE**

11.     To the extent not set forth herein, Nielsen reserves the right to assert additional

defenses that may come to light as a result of discovery or other proceedings in this case.

 Dated:  January 4, 2021                    Respectfully submitted,

                                            NIELSEN HOLDINGS PLC;
                                            THE NIELSEN COMPANY (US), LLC;
                                            ACNIELSEN CORPORATION

                                            By:/s/ *Cardelle B. Spangler*
                                               One of Their Attorneys

                                            Cardelle B. Spangler
                                            Benjamin M. Ostrander
                                            John E. Drosick
                                            WINSTON & STRAWN LLP
                                            35 West Wacker Drive
                                            Chicago, Illinois 60601
                                            (312) 558-5600
                                            (312) 558-5700 (fax)
                                            cspangler@winston.com
                                            bostrander@winston.com
                                            jdrosick@winston.com

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned attorney states that on the 4th day of January, 2021, she caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system and to be served via electronic transmission upon:

Linda D. Friedman
Jennifer S. Gilbert
Matthew J. Singer
STOWELL & FRIEDMAN, LTD.
303 W. Madison Street, Suite 2600
Chicago, IL 60606
lfriedman@sfltd.com
jgilbert@sfltd.com
msinger@sfltd.com

*Attorneys for Plaintiff*

By: */s/ Cardelle B. Spangler*
Cardelle B. Spangler